**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **(1) TRAYSHA R. MOLER,** | **)** | |
| **PLAINTIFF** | **)** | |
| **v.** | **)** | **CASE NO. CIV-20-515-PRW** |
| | **)** | |
| **(1) ENBRIDGE EMPLOYEE** | **)** | **JURY TRIAL DEMANDED** |
| **SERVICES, INC.;** | **)** | **ATTORNEY'S LIEN CLAIMED** |
| **DEFENDANT** | **)** | |

## COMPLAINT

COMES NOW the Plaintiff, Traysha R. Moler, and her claim for damages which she incurred as a result of discrimination arising from her employment with Defendant Enbridge Employee Services, Inc. Plaintiff hereby alleges and states as follows:

## PARTIES

1. Plaintiff Traysha R. Moler is a resident of Beckham County and a citizen of the State of Oklahoma.

2. Defendant Enbridge Employee Services, Inc. ("Enbridge") is a foreign for-profit business incorporated under the laws of the State of Delaware and based in Alberta, Canada. Defendant is registered to do business in the State of Oklahoma. Defendant may be served with process by serving its registered agent: The Corporation Company, 1833 S. Morgan Road, Oklahoma City, OK 73128.

## JURISDICTION

3. The Court has jurisdiction over the lawsuit because the suit arises under 42 USC §§ 2000e, et seq., more commonly known as Title VII of the Civil Rights Act of 1964, as amended.

4. During all times relevant to this action, Plaintiff was an employee of Enbridge. During her employment, she was the victim of sexual harassment in violation of Title VII and the Oklahoma Anti-Discrimination Act ("OADA").

5. The Court has supplemental jurisdiction on 28 USC § 1367 of Plaintiff's claims for violations of the OADA against Defendant because Plaintiff's claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

6. The same acts described below that violate Title VII constitute violations of the Oklahoma Anti-Discrimination Act.

## VENUE

7. Venue is proper in this district under 28 USC § 1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Plaintiff was employed by Enbridge in Elk City, Beckham County, Oklahoma. A majority of Plaintiff's work occurred in and around Beckham County. Beckham County is part of the Western District of Oklahoma.

## ADMINISTRATIVE REQUIREMENTS PRIOR TO FILING

8. Plaintiff filed a claim with the Equal Employment Opportunity Commission ("EEOC") and co-filed with the Oklahoma Office of Civil Rights Enforcement on September 24, 2018, within 180 days of the date of her separation. On October 10, 2018, EEOC advised Plaintiff that her claim was filed out of time. On October 22, 2018, she provided an updated timeline to EEOC which included timely claims of discrimination. Her charge was issued on February 5, 2019, and her Dismissal and Notice of Rights letter was issued on March 4, 2020.

9. This Complaint is filed within 90 days of the date Plaintiff received the Dismissal and Notice of Rights Letter.

## STATEMENT OF FACTS

10. Enbridge is an energy delivery company, which moves oil and natural gas across Canada and the United States.

11. Enbridge's Anti-Harassment Policy prohibits all harassment including sexual harassment. The Policy gives examples of behaviors that constitute sexual harassment.

12. Managers and supervisors are responsible for enforcing the Anti-Harassment Policy and are subject to discipline for failing to do so.

13. Employees are responsible for complying with the Anti-Harassment Policy and "immediately ceas[ing] any behavior or action upon becoming aware that someone finds it offensive."

14. The Anti-Harassment Policy provides a complaint procedure for employees who feel they have been harassed. The procedure begins with notifying the offender of the offensive behavior, then the steps to take to escalate the complaint if necessary.

15. The Anti-Harassment Policy prohibits retaliation by employees who avail themselves of the complaint procedure.

16. Employees are required to acknowledge upon hire and complete annual computer-based training on Enbridge's policies, including the Anti-Harassment Policy.

17. Enbridge's "Guidelines for Internal Posting & Internal Applicants" allows for an exception to posting an internal vacancy in certain circumstances, such as employee reassignment.

18. Plaintiff is a member of a protected class in that she is female.

19. Plaintiff has worked in male-dominated field positions since 1994.

20. Plaintiff was employed as an Operations Technician by Defendant Enbridge from April 17, 2013, until approximately March 29, 2018.

21. On information and belief, Plaintiff was the only woman hired by Enbridge to work in the field in her area.

22. Plaintiff worked as an Operations Technician for approximately two to three months. Thereafter, Plaintiff worked as a Line Locator.

23. Plaintiff did not have to make an internal application to move from Operations Technician to Line Locator. Her supervisor asked for volunteers, Plaintiff volunteered, and she was reassigned.

24. Beginning on or around October 21, 2013, Plaintiff's male supervisor, Terry Gardner ("Gardner"), began discriminating against her.

25. Gardner scrutinized Plaintiff's actions and communicated with her in an unprofessional manner. For example, Gardner accused Plaintiff of not submitting her time sheets after she had turned them in. Gardner then nit-picked Plaintiff's entries. On information and belief, male employees were not chastised in the same way.

26. Gardner told other employees that he did not think women should work in the field.

27. After approximately, three to four months, Gardner was transferred to another location.

28. In approximately May 2016, Jeff Goe ("Goe"), Operations Technician and Line Locater, solicited Plaintiff for sex several times while they were on the job together.

29. Goe forced himself on Plaintiff by groping her breasts and attempting to kiss her.

30. Goe made comments to Plaintiff such as "You know you want me," and "You know you want this," referring to his penis.

31. On one occasion, Goe made thirteen (13) successive calls to Plaintiff in a short period of time.

32. Plaintiff reported Goe's behavior to Area Supervisor Chris Mitchell ("Mitchell").

33. Mitchell told Plaintiff it was his job to report the complaint to his supervisor, Clint McAnally, but Mitchell asked Plaintiff if she wanted him to report Goe's conduct. Plaintiff said "yes," but she is unaware of whether Mitchell made the required report.

34. Plaintiff had the impression that Mitchell wanted to sweep the matter under the rug.

35. On approximately May 27, 2016, Goe texted pictures of his penis to Plaintiff on her personal cell phone.

36. On or around June 6, 2016, Plaintiff again reported Goe's conduct to Mitchell.

37. On or around June 8, 2016, Plaintiff reported Goe's behavior to McAnally.

38. On information and belief, McAnally interviewed Goe, and Goe admitted to sexually harassing Plaintiff.

39. The complaint was reported to Human Resources Allison Seabold ("Seabold").

40. Seabold met with McAnally and Mitchell.

41. Seabold interviewed Goe, who admitted his behavior. Goe agreed to leave Plaintiff alone.

42. Goe was allowed to remain employed until June or July 2017; it is unknown whether he was disciplined for his sexually harassing behavior.

43. In June or July 2016, Plaintiff and Inspector Tom Hewitt ("Hewitt") disagreed over how to proceed with handling a line leak. Plaintiff refused to act in a way that violated Enbridge's policies.

44. Thereafter, Hewitt always called Plaintiff "Sir."

45. Corrosion Technician Jaryn Green ("Green") was one of Plaintiff's co-worker. Green and Plaintiff got along well until approximately February 22, 2017.

46. On or around February 22, 2017, Green began sexually harassing Plaintiff. Plaintiff rejected his advances, and the harassment intensified.

47. Green asked Plaintiff to flash her breasts at him and invited her to lunch so she could give him a "hand job."

48. Green showed Plaintiff pictures and videos of Green masturbating in the office restroom.

49. In front of Inspector Hewitt, Trevon White, and other employees and contractors, Green made derogatory comments to Plaintiff such as "Tom Cruise, sir, ma'am, it, or whatever it is you call yourself."

50. On or around February 23, 2017, Plaintiff reported Green's behavior to Area Supervisor Donnie Ford ("Ford").

51. Ford told Plaintiff "That's just how guys are."

52. On information and belief, Ford did not counsel or otherwise disciple Green for his conduct.

53. Thereafter, Ford excluded Plaintiff from meetings and lunches.

54. Ford harassed Plaintiff in her off time, tried to send her to jobs that were outside her assigned area, and refused to transfer her within the company.

55. In February 2017, Plaintiff spoke with Senior Human Resources Business Partner Marcie Freiley ("Freiley"), who directed Plaintiff to speak with Ethics and Compliance Officer Tamara Meyer ("Meyer").

56. On February 23, 2017, Plaintiff spoke with Meyer and agreed to meet with her in Houston Texas on February 27, 2017.

57. Plaintiff explained to Meyer the sexual harassment she was enduring in the workplace; Meyer agreed to investigate.

58. Plaintiff told Meyer that, although she loved being a line locator, she had applied for a position working in a compression station to escape the harassment.

59. Upon her return to Elk City, Upon her return, she submitted receipts for reimbursement of her expenses.

60. Supervisor Dennis Shifflet ("Shifflet") learned of Plaintiff's complaint, and on information and belief, Shifflet interviewed Green.

61. Afterwards, Shifflet asked Plaintiff if she would talk to Green so Green could apologize to her. Plaintiff declined.

62. Green continued to work with Plaintiff; Plaintiff kept her distance from him.

63. After she went to Houston, Mitchell began to treat Plaintiff in an unprofessional and unacceptable manner. For example, Mitchell gave Plaintiff "go to hell" looks and stared her down. Plaintiff did not have problems with Mitchell until after she made her formal complaint.

64. Mitchell refused to transfer Plaintiff to another position within the company.

65. Mitchell stopped inviting Plaintiff to lunch and was not invited to attend meetings that her male peers were invited to attend.

66. Plaintiff made a transfer request to District Supervisor Tom Goslin ("Goslin"). Goslin refused the request.

67. Area Supervisor Will Sharpton ("Sharpton") drove by Plaintiff's house several times. She felt as if he was stalking her.

68. Hewitt always called Plaintiff "Sir."

69. On March 20, 2017, Plaintiff was called out for an emergency line locate near a grass fire. The station was not in her area, but she responded anyway due to the emergency.

70. Plaintiff notified Mitchell because her own supervisor was off; Mitchell was rude to Plaintiff and questioned her for responding.

71. In April 2017, Plaintiff noticed that management and co-workers were treating her rudely. She asked Office Administrator Kim Tillman ("Tillman") if she knew what was going on. Tillman told Plaintiff that no one wanted to work with or talk to Plaintiff "because of what happened with Jeff [Goe] and Jaryn [Green]."

72. In September 2017, Ford accused Plaintiff of not turning in all of her receipts for her February trip to Houston. Plaintiff felt that she was being harassed and/or retaliated against for reporting sexual harassment.

73. On or about September 26, 2017, Plaintiff was not notified of the pre-job meeting regarding digging and pouring of concrete in one the stations assigned to her. Yet Plaintiff was blamed when a concrete slab was poured over a line in violation of Enbridge policies.

74. Mitchell had trained Plaintiff to never clear a "one call" ticket out of the system until it had been completed, even if it showed up as late.

75. Over 4.5 years, Plaintiff completed approximately 5,000 locates and had never been told to change the date and/or time on a ticket.

76. On or about October 10, 2017, Ford talked to Plaintiff about late "one call" tickets.

77. Ford told Plaintiff to change the date and time on her "one call" tickets so the system would not register that the ticket was completed a late.

78. Plaintiff felt that Ford wanted her to change the date and/or time on the tickets so she would be fired.

79. In October 2017, Inspector Chad Coole ("Coole") told Plaintiff that Garrett Farmer was doing locates in the Sweetwater Plant. The Sweetwater Plant was in Plaintiff's area. As a result, Plaintiff would be liable for any errors or omissions made by Farmer.

80. On or about November 6, 2017, Ford held a meeting with Plaintiff and other employees. All employees except Plaintiff were given new Enbridge caps and pens. Plaintiff was the only female at the meeting.

81. During office meetings, the men would move their chairs away from Plaintiff, the only female.

82. In November 2017, Ford directed Plaintiff to go to the Silver Fox Station to fill out protocol agreement for Construction Coordinator Richard Qualls ("Qualls") to dig inside the station with mechanized equipment, which was against Enbridge policy. Enbridge's policy required the use of hydrovac equipment inside the station.

83. Plaintiff refused to sign the paperwork because the activity was in her area, and she would be held liable.

84. Plaintiff had been requesting a transfer within the company for several months. Ford led Plaintiff to believe that she could be transferred. Plaintiff followed up with Ford several times over the next few months; each time she was told Ford had not heard anything about a transfer.

85. However, after several months had passed, Ford told Plaintiff that she had to go online to apply for open positions. Ford had not previously advised Plaintiff of this requirement.

86. From November 2017 to February 2018, Plaintiff was off work due to illness.

87. Plaintiff had not fully recovered from her illness when she returned to work in February 2018.

88. Upon her return to work, the hostile work environment continued, which exacerbated her illness.

89. Plaintiff again asked Ford to transfer out of his area; her request was refused.

90. After years of enduring a hostile work environment, and management's failure to address her concerns, Plaintiff was constructively discharged effective March 29, 2018.

**FIRST CAUSE OF ACTION**

**SEXUAL HARASSMENT IN VIOLATION OF TITLE VII**

91. All previous paragraphs are incorporated as if set forth within.

92. Plaintiff is a female employee protected under Title VII.

93. Defendant is an employer within the meaning of Title VII, is engaged in an industry affecting commerce, and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

94. The following were employees or contractors of Defendant: Goe, Green, Hewitt, Coole, Farmer, and Qualls (collectively, the Individual Offenders).

95. The following were Plaintiff's supervisors or otherwise empowered by Defendant to take tangible employment actions against Plaintiff: Gardner, Mitchell, McAnally, Ford, Shifflet, Goslin, and Sharpton (collectively, Supervisory Offenders). On information and belief, each of these individuals had the authority to enforce

Defendant's policies, prohibit sexual harassment, refrain from engaging in sexual harassment, and reassign Plaintiff to a different position.

96. The Individual Offenders and Supervisory Offenders created a sexually hostile work environment through their discriminatory words and actions towards Plaintiff. Their conduct was so severe that it altered the terms and conditions of Plaintiff's employment and created an intimidating, hostile, and offensive work environment. Plaintiff was subjected to verbal, visual, and physical sexual assaults of varying degrees.

97. Defendant is directly liable because it was negligent in remedying the discriminatory conduct. Plaintiff made multiple complaints to multiple local supervisors and corporate individuals over a period of years, yet the discriminatory conduct continued and intensified.

98. Defendant is vicariously liable for the Individual Offenders' discriminatory conduct. The Individual Offenders were employees and/or contractors of Defendant and engaged in conduct that was in direct violation of Defendant's Anti-Harassment Policy. Defendant did not exercise reasonable care to prevent and promptly correct the discriminatory conduct, even though Plaintiff took advantage of Defendant's measures designed to prevent and correct discriminatory conduct. Plaintiff had complained through her chain of command pursuant to Defendant's policies.

99. As a direct and proximate result of Defendant's conduct, Plaintiff suffered the following damages:

a. Plaintiff was constructively discharged and has incurred expenses in seeking other employment;

b. Plaintiff suffered loss of her pension and/or retirement benefits;

c. Plaintiff seeks compensation for all lost wages and benefits, Reinstatement of Plaintiff in her previous position is impractical and unworkable. Therefore, Plaintiff seeks an award of front pay and retirement benefits to compensate her; and

d. Plaintiff has suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of his peace of mind as a result of Defendant's unlawful conduct which any reasonable person would have suffered under like circumstances, and other non-monetary losses.

100. Plaintiff is entitled to an award of attorney fees and costs under Title VII, 42 U.S.C. § 2000d-5(k).

101. Plaintiff has been injured in an amount in excess of $75,000.00 and is entitled to judgment against Defendant for its wrongful conduct.

**SECOND CAUSE OF ACTION**

**VIOLATION OF THE OKLAHOMA ANTI-DISCRIMINATION ACT**

102. All previous paragraphs are incorporated as if set forth within.

103. Defendant is an employer within the meaning of the Oklahoma Ant-Discrimination Act ("OADA") because it is a legal entity, institution, or organization that pays one or more individuals a salary or wages for work performance. Plaintiff was an

employee within the meaning of the OADA in that she received a salary or wages from an employer. *See* Okla. Stat. tit. 25 § 1301.

104. It is a discriminatory practice for an employer to discriminate against an individual with respect to the terms and conditions of employment because of sex. *See* Okla. Stat. tit. 25 § 1302.

105. The actions described in the previous paragraphs amount to Defendant's discriminating against Plaintiff with respect to the terms and conditions of employment because of sex.

106. Plaintiff complained through her chain of command pursuant to Defendant's policies in an attempt to end the sexual harassment.

107. Defendant is directly liable because it was negligent in remedying the discriminatory conduct. Plaintiff made multiple complaints to multiple local supervisors and corporate individuals over a period of years, yet the discriminatory conduct continued and intensified.

108. Defendant is vicariously liable for the Individual Offenders' discriminatory conduct. Many of the Individual Offenders were employees of Defendant and engaged in conduct that was in direct violation of Defendant's Anti-Harassment Policy. Defendant did not exercise reasonable care to prevent and promptly correct the discriminatory conduct, even though Plaintiff took advantage of Defendant's measures designed to prevent and correct discriminatory conduct.

109. As a direct and proximate result of Defendant's conduct, Plaintiff suffered the following damages:

a. Plaintiff was constructively discharged and has incurred expenses in seeking other employment;

b. Plaintiff suffered loss of her pension and/or retirement benefits;

c. Plaintiff seeks compensation for all lost wages and benefits, Reinstatement of Plaintiff in her previous position is impractical and unworkable. Therefore, Plaintiff seeks an award of front pay and retirement benefits to compensate her; and

d. Plaintiff has suffered, and continues to suffer, the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of his peace of mind as a result of Defendant's unlawful conduct which any reasonable person would have suffered under like circumstances, and other non-monetary losses.

110. Plaintiff is entitled to an award of attorney fees and costs under Okla. Stat. tit. 25 § 1350(H).

111. Plaintiff has been injured in an amount in excess of $75,000.00 and is entitled to judgment against Defendant for its wrongful conduct.

WHEREFORE, Plaintiff Traysha R. Moler demands judgement in her favor against Defendant Enbridge Employee Services, Inc. in an amount in excess of $75,000 for its wrongful, improper, and illegal conduct. Plaintiff Traysha R. Moler requests that she be awarded back pay, front pay, compensatory damages, damages for harm to her reputation, mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and

disruption of her peace of mind. Plaintiff Traysha R. Moler further requests that the Court award pre- and post-judgment interest, costs, and attorney fees associated with this suit, and any and all other relief that the Court deems just and equitable.

Respectfully submitted,

*s/ Katherine M. Bushnell*________
Rachel Bussett, OBA #19769
Patricia A. Podolec, OBA #21325
Katherine Bushnell, OBA #34196
Bussett Legal Group, PLLC
2201 N. Classen Blvd.
Oklahoma City, OK 73106
Telephone: (405) 605-8073
FAX: (405) 212-9112
Email: Rachel@BussettLegal.com
PPodolec@Bussettlegal.com
Kathy@Bussettlegal.com
*Attorneys for Plaintiff Traysha R. Moler*

*ATTORNEY'S LIEN CLAIMED*
*JURY TRIAL DEMANDED*